Madam Clerk, please call the next case. 114-3301, Elite Staffing v. Edmond Gwendolyn Good morning, Justices. Council may please accord Elizabeth Capoletti on behalf of the employer Elite Staffing. I would respectfully request that the Commission's decision planning a causal relationship between the date of accident of January 15, 2010, and the claimant's lower back condition be reversed as being against the manifest weight of the evidence. This matter proceeded to hearing on February 19, 2013, with the main issue in dispute being causal relationship. The claimant filed an application of adjustment of claim on February 16, 2010, a month after his accident, claiming injury solely to his right shoulder. And his medical treatment immediately following the accident centered almost exclusively to his right shoulder and upper back. Is that really a fair characterization, Ms. Capoletti? I'm sorry? Is that really a fair characterization of what happened after this accident? I believe it is. I mean, there is no question. I wouldn't stand up here and tell you he did not indicate that he had lower back problems. He was treated for it. He certainly did. Treat for lower back problems. But when he was initially seen by Premier Orthopedics on January 16, 2010, he gave a history of lifting a pallet, a pop in his right shoulder, hearing a pop in his right shoulder and upper back. He then went to Silver Cross. Well, can I ask a question? Sure. Premier Orthopedic Health, didn't he present with pain radiating to the lower portion of his back? To the orthopedic physician? I mean, there's no question that he spoke about back problems, certainly beginning in earnest in April of 2014. And they diagnosed, no, not April, January the 15th or January the 16th. Didn't they diagnose an abnormal range of motion in his lower back as well as muscle spasms and tenderness in his lumbar spine? On January the 16th? On January 16th, they have it here. Yes, this is on C252. He gives a history of lifting, feeling a pop in his right shoulder and upper back, and they have a thoracic strain sprain in a sprained lumbar region. There's no question that that's there. January 25th at the Sue Redd Clinic, he complained of worsening lower back pain resembling pins and needles radiating into his right buttock. He certainly provided a history. But then as of April 21st, also to Dr. Duru at the Sue Reed Clinic, he had said at that time, patient does not complain of lower back pain anymore, and his pain is constantly in his right rhomboid and lateral rib cage like it was initially. Okay. And there was a tear at L45? Certainly. And Dr. Bernstein interpreted the MRI to be degenerative in nature and inconsistent with any type of injury because as of the date that he saw him, on July 18th of 2010, he was on plates of low back pain. Sweeney viewed the MRI end of the CT scan and he found that the preexisting condition was enhanced by additional injuries that he claimed to be directly related to the work accident. And didn't Vargas and Rinella make the same findings? Absolutely. There's no question. Why wouldn't that carry the day, those three doctors? Why wouldn't that carry the day versus Bernstein? Versus Bernstein because I submit to you that he had a more accurate understanding of the claimant's initial complaints of pain, which really did center upon his upper back and shoulder. Now you're falling into the netherworld. Who makes the determination of whether there's an accurate understanding? Us or the commission? Manifest way of the evidence is certainly a high hurdle for any of us. Bernstein acknowledged in his deposition testimony that although the claimant had a degenerative condition, it could have been aggravated by a sudden trauma. He acknowledged that. He also said that when he evaluated the claimant on July 19th of 2010, that the claimant voiced no complaints of low back pain and he actually had a complete pain diagram which showed no complaints of low back pain, which I would submit is consistent with that initial treatment for the first several months where the pain was really focused on his right shoulder and upper back. I mean, he treated with Dr. Comondory on the first occasion and it really was just relative to his right shoulder. He chose not to go back to Comondory and then he treated with Dr. Rhodes for a significant period of time, February, March, and April. Again, all in relations to his upper back and right shoulder. And I'm certainly not trying to argue that there were not mentions of low back pain. There certainly were. So we have conflicting medical testimony and you've given us your argument of why Bernstein has a better understanding of security today. Correct. What about your two physician referral violation? Well, the two physician referral violation is that the claimant initially on direct exam testified that he was initially referred by Dr. Doru to Dr. Rhodes. He testified that Dr. Doru also referred him to Dr. Preja. He testified that Dr. Preja referred him to Dr. Vargas. He testified that Dr. Vargas referred him to Dr. Rinaldi. And he testified that Dr. Rinaldi referred him to Dr. Kube. Now, on cross-examination, he contradicted this testimony and said that all of the referrals were from Dr. Doru at Clinica Suri. Dr. Doru, on January 27th of 2010, certainly indicates that the claimant should be evaluated by Dr. Rhodes, but Dr. Rhodes' records make no mention of the claimant actually being referred by Dr. Doru. So I would submit to you that Dr. Rhodes is actually the claimant's second choice. Next, the claimant is seen by Dr. Vargas. And again, the claimant initially testified that Dr. Preja referred him to Dr. Vargas, but Dr. Vargas' medical records don't bear out this testimony. In fact, Dr. Vargas' medical records specifically indicate that he was referred there by Dr. Gavin. I'm not sure who Dr. Gavin is. Now, let me see if I can clarify. Your contention is Dr. Rhodes constituted the claimant's second choice of physicians, correct? That's correct. And you've alluded to in the notes of January 27th, 2010, Dr. Doru stated that the claimant would be seeing Dr. Rhodes for a, quote-unquote, ortho consult, correct? That's correct. And the same day, the claimant is examined and treated by Dr. Rhodes, just by some miraculous coincidence? On the 29th, he's seen by Dr. Doru. Yes, on the 27th, he makes records. Right, and two days later, he's there. That's correct. But I didn't see him specifically saying that there was per se a referral to him. On the January 25th, which was his initial evaluation with Dr. Doru, that indicated that there was a specific referral to him as opposed to Dr. Preja, where I think the record specifically indicated that there was an actual referral to him. And there were actually referrals. I'm not disputing that there were actual referrals to Dr. Sweeney from Dr. Cohen and, I believe, Dr. Cube as well. I mean, but there was no real specificity relative to Dr. Rhodes. It certainly indicated in there that he was to be evaluated from him. As to Dr. Vargas, are you suggesting that Dr. Gavin was not a treating physician at Sourette? I'm not suggesting that. I'm saying that the claimant testified that the only physician he ever saw at Clinica Sourette was Dr. Doru. Except for one problem. The medical records, some of the medical records are signed by Dr. Gavin on behalf of Sourette. So, I mean, did he sneak into the building and start signing records that weren't his? Well, the petitioner testified that the only person he ever saw treatment with at Clinica Sourette was Dr. Doru. And that was his claim. I think in one of the records, Dr. Doru specifically stated that he was going to be out of town for a period of time and that Gavin would be acting as a treating physician in his stead. So we've got Doru saying that Gavin is part of Sourette. And if he's part of Sourette, then Vargas is within the chain, isn't he? It would appear he would be. And then if we assume that Rhodes is within the chain and Vargas is within the chain, then it doesn't make any difference that Dr. Rinell is outside the chain because he'd only be the second choice. If you assume that Dr. Rhodes is within the chain, that's correct. I'm just saying that it was consistent relative to the petitioner's testimony, was that he had only seen Dr. Doru and that Dr. Doru had done the referral to him. That was that. Thank you for your time. Thank you. Thank you. Counsel? Counsel? Counsel? Good morning, everyone. Good morning. Good morning. Good morning. My name is Dominic Macchiarello. I will present the penalty here in Miguel Gonzalez. Basically, our position is simply set forth with clarity in our brief. The decision before us can't be made simple. As you're familiar with the standard review, there's no need to go into it. The question of facts regarding causal connection of the injury, the reasonableness of the medical charges, and their causal relationship to the work injury have already been resolved by the arbitrator, by the commission, and by the circuit court. We feel the decision should be further affirmed here. The evidence on the record alone is enough to support the commission's decision. Because it is within the province and the commission to assess the credibility of the witnesses. Counsel, we understand that. Tell us why it's not against the manifesto of the evidence. Get to the point. I'm sorry? And holding on to her point when you do that, the only thing she seems to be saying is Bernstein had, in her opinion, a superior understanding of the medical evidence, recognizing there's conflicting medical evidence on the other side. So tell us why her argument doesn't carry the day. Certainly. The records and the facts clearly show that Dr. Sweeney's examination stemmed from a referral from Mark Cohen, who was a referral from Mr. Gonzalez's primary care doctor, Dr. DeRue, and that he had reviewed all the prior medical records, which show the consistent complaints of lumbar pain from the very beginning at the premier occupational health all the way through his treatment with Dr. Sweeney. Dr. Sweeney further relied on the actual MRI films, not just the reports, which Dr. Bernstein relied on. He also reviewed the CT films themselves and conducted his own examinations of Mr. Gonzalez to reach a diagnosis and a treatment plan, which his treatment plan was also concurred by two other orthopedic surgeons saying that he needed a fusion surgery. That was based on an aggravation of a pre-existing condition as a result of this work injury, which, of course, is understood as well. The arbitrator filed a sworn testimony of Dr. Sweeney to be more credible than that of the testimony of Dr. Bernstein, who testified that his practice largely consists of these type of independent medical exam reviews. Dr. Bernstein, whose only lone, solitary examination found Mr. Gonzalez could return to work full duty, full time, no further treatment be rendered. Yet, Dr. Mr. Gonzalez was working full time, full duty prior to this accident, and after the accident, he hasn't worked since. So for all those reasons, the commission's decision was not against the manifest way of the evidence is what you're telling us? Yes, Your Honor. Okay. What about this referral issue? Go ahead. Based on the underwritten testimony of Mr. Gonzalez, in conjunction with the medical evidence, the commission found a sequence of referrals existing, which is not outside of Section 8A. 8A is specifically quoted in my brief. The appellate actually concedes in their brief that the referrals of Dr. Peralia, Dr. Q, Dr. Cohen, and the operating surgeon, Dr. Sweeney, We're only concerned about Rhodes and Gabbin. That's all we're concerned about, or Vardy. Understood. Actually. Respondents' only real argument is Dr. Rhodes, Dr. Vardy, Dr. O'Neil are outside the referral chain. However, this theory is flawed. We want some medical records reviewed thoroughly. Specifically, on January 27, 2010, the records of Dr. Gonzalez, Mr. Gonzalez's primary care doctor, indicated he's going to see an orthopedic surgeon. On January 29, 2010, he sees Dr. Boyer-Roney, an orthopedic surgeon, for the evaluation. The commission found this to be sufficient to be a referral. Mr. Gonzalez also testified that Dr. Parajia prescribed him injections to be administered by Dr. Vargas, who actually maintains an office adjacent to Dr. Parajia's office. And also, the fact that respondents there have also claimed that Dr. Gabbin gave the referral to Dr. Vargas, Dr. Gabbin is a doctor with Clinica Sudrette. Therefore, by this point, he's been treated with Clinica Sudrette throughout the entirety of his treatment. Whatever doctor he saw, he always went back to Clinica Sudrette. Clinica Sudrette directed his care and gave him the referrals to all these doctors. Without Clinica Sudrette, he would not have seen any of these doctors. Therefore, all these doctors are a result of that single referral chain. Even if Dr. Renauld is outside of it, that only qualifies as a second choice of doctors, and that's not outside of Section 8A. Based on the evidence, the Commission recently inferred that the employee did not exceed his choice of doctors, and the chain of referrals that existed did not exceed the allowable under Section 8A. Therefore, the decision of the Commission is not against a manifest weight, and should be affirmed. Thank you. Thank you, Counsel, for your argument. Thank you, Counsel Capaletti. Thank you, Counsel, both for your arguments in this matter this morning. They can be taken under advisement. A written disposition shall issue.